We'll hear argument first this morning in Case 11-1160, the Federal Trade Commission v. Phoebe Putney Health System. Mr. Horwich. Thank you, Mr. Chief Justice, and may it please the Court. The State action doctrine provides defense to a Federal antitrust suit when a State has clearly articulated and affirmatively expressed an intent to displace competition with respect to the particular activity at issue in the suit. Now, in practical terms, what that comes down to is whether application of Federal competition law would somehow subvert a sovereign State policy choice that's clearly evident in State law. Now, that policy might be expressed in mandatory or compulsory terms, but short of that, it would also be enough if the State had specifically permitted conduct that is inherently anti-competitive. But a grant of general power to act. Sotomayor, you don't think that the grant of powers in this case would permit the hospital authorities, the corporation, to set prices for their services that are below the competitive prices in order to serve the needy? Well, it doesn't say. Isn't that inherent in the regulations? I think it is, although for reasons that don't affect the analysis of the question about an anti-competitive acquisition. And let me explain why the analysis might be different with respect to prices. There is specific authorization in the statute for the hospital authorities in conjunction with the counties to partly fund, or I guess entirely in principle, fund their services through tax revenues. So they have another source of funding that would allow them to price in ways that a competitive actor would not necessarily price its services. So if we're talking about particular pricing decisions, say, I guess it would be below cost pricing that is alleged to somehow be anti-competitive, then there might very well be a State action defense to that, because the State's power to price services subsidized in a way that an ordinary actor wouldn't be able to do might very well displace competition in that way. Scalia, do you have any cases in which we slice it that fine, that you're a State actor for some anti-competitive purposes and not for others? Absolutely, Justice Scalia. I think the best example comes from Goldfarb v. Virginia State Bar. So in that case, the issue was a challenge to a practice of minimum fee schedules that were set by, not by the State, but agreed upon by a bar organization. Now, the State in that case, of course, regulated the practice of law. It regulated admission into the practice of law. It regulated certain aspects of the conduct of the practice of law. And this Court held in Bates v. Arizona State Bar that those sort of regulations do constitute State action. But the Court did not accept the submission that the State action defense covered the setting of minimum prices that was at issue in that case, because that was not something that there was State action over. And as a — and taking a step back, the justification for the State action doctrine is that the State is trying to pursue some policy that is part of its traditional sovereign prerogatives to regulate its own economy, and that Federal law was not understood to intrude upon that. But if the State is not actually trying to advance some other policy with respect to the particular conduct at issue, then it can't be said that the State has done something that Federal law should stand aside for.  If the State specifically authorized local hospital authorities to acquire any and all hospitals within their geographic area, then the clear articulation requirement would be satisfied, but the authorities' law does authorize the acquisition of other hospitals, and it doesn't say one or two, it says other facilities. So why doesn't the hospital laws law do exactly what you said would satisfy the clear articulation requirement? Well, I think the key difference there, Justice Ginsburg, between the hypothetical we offered in the reply brief and the statute here, is that the additional words, any and all, make it clear that the State is contemplating that there could be, that the county might opt for socializing its hospital services, putting all of them under the control of the hospital authority. And by contrast, what we have here is an ordinary corporate power to acquire property. And like all of the ordinary corporate powers that the authority possesses that are, that resemble those that an ordinary business corporation would have, the most natural understanding of them is that the State expects them to be exercised in conformity with the background principles that, that bind everybody. So if certainly your answer, Justice Ginsburg, you're saying there would be a difference if the charter said the authority may acquire any properties to fulfill its mission, and if it said the authority may acquire properties to promote its mission? Well, I think it's probably in our, the hypothetical offered in our reply brief, it's probably the all, the any and all that would, I think, be what communicates the State's intention. But do you think a general saying they may acquire properties doesn't implicitly say they may acquire all properties? It seems to me that it doesn't. No, I don't think it does. Well, I, I, but I think in this area it's, it's important for a couple of reasons that we actually have, have some substantial assurance of what the State is trying to do here, and a, a power to grant property, excuse me, a power to acquire properties generally speaking unadorned with any particular expression from the State about how, how that power is to be used, is, is something that can be used competitively or anti-competitively, and you can't infer from that that the State really has an objective of, as I say, essentially socializing its hospital services because, and, and it's, and that, that clarity of expression from the State is really important here for, for several reasons. First of all, this is an odd rule to begin with in that it allows State law to displace Federal law. So we would want clarity of expression. Scalia, I assume, I assume that a normal corporate charter contains such a provision, the authority to acquire property, right? Yeah, it absolutely does. And we don't think that. And that charter is issued by the State, right? It is issued by the State. And we don't, we don't think that that enables all corporations to ignore the Sherman Act, do we? No, we don't. And we don't generally think that those corporate powers express an intent to displace any other background principle. If I could give some examples, maybe we could look at some. Mr. Walsh, could I just, before you give examples, just make sure I understand your basic position. Suppose the State had said very clearly that these hospital authorities had the power to engage in acquisitions of hospitals that, for a normal actor, would violate the antitrust laws. But basically said the hospital authorities had the discretion to do that or not. And the State didn't know the hospital authority might do it, but it also might not do it. That would be subject to the immunity, is that correct? I think the defense would be available if the beginning of your hypothetical was kind of quoting the statute. Yes. Yes. It's a clear grant of authority, but the authority is completely discretionary. So the State is basically saying, we don't know, we're going to let the hospital authority figure it out. Well, it's certainly the hospital authority can figure it, figure out, but what it's figuring out is whether to actually invoke a displacement of competition that the State has expressly put on the table. And that's what's different in this case. What I'm trying to get at is the State has put it on the table only as a completely discretionary action. The State has not expressed a preference for it. The State has only said that the hospital authority can think about conditions on the ground in its particular locality and can decide whether such an anti-competitive acquisition is appropriate. Yes. That's fine. We don't have any quarrel with States setting up a clear set of tools, some of which, in your example, might inherently displace competition and having it exercised actually at a local level. That's fine. So all this language in your brief about necessarily and inherently and compelled, all of those things really are not part of your governing test. No, I disagree with that. The reason they're part of our governing test is this, is that a State can certainly give a menu of specific options that sub-State entities can select from, and it might be that some of those are, in fact, not anti-competitive. Let me give you an example from this Court's cases. Southern Motor Carriers involved the submission by motor carriers of their rates to a public service commission that was that would accept them as filed rates. Now, the States, some of the States there said, well, you could file them individually or you can file them jointly. And we don't necessarily have a preference one way or the other for it, but the fact that the States had said you can file them jointly, which is a horizontal agreement among competitors and sure looks anti-competitive, the fact that the State had said that and put that option on the table qualified as a clear articulation from the State that it intended the displacement of competition to occur if that specific option was chosen. The difference here is that if you're willing to say, in a case like what we have here with the statute, that confers a power that is entirely neutral as to how it would be, how it could be exercised. You have the problem of not really knowing what the State would intend, and so you can't say that the State clearly intended that there be displacement of competition. Breyer, what about the other, the next line that they give, is they give to the hospital authority the power to acquire and operate projects and the power to form and operate one or more networks of hospitals, physicians, and other health care providers. Now, as I read that, it certainly includes the rather specific power of acquiring a hospital. And having read that, not just something you might see in General Motors' charter. And that's the language of the grant of power. Now, I want to know what you want us to do, because in my mind, reading this, it's a statute that provides for regulation, price regulation of hospitals. And you say, and I have no doubt, you thought of one way in which that could be. I can think of a hundred that you could have, prices that are different from those set by a free market. So I have no doubt that this sets the start there. Now, what is it, I go back to Justice Scalia's original question, what is it you want us to say? Even though this statute is immune, does grant immunity from attack on a basis of cost and price regulation, it is not immune in respect to mergers. Okay? I can, unfortunately, think of about 50 examples where a merger might be anticompetitive, and yet it would lead to lower prices. And a Department of Justice might attack it. But this statute, and that's what's bothering me, seems to want to further that kind of thing. That's where I am, and I'm not at all decided. Fisherman, I guess I would first point out that price competition is not the be-all and end-all of anticompetitive consequences, right? Breyer, I think I know that. I mean, we have this concern, obviously we have a concern here that without the end all, you have to take as a given that even though what you say is true, I would   I mean, I think it's very clear in the complaint, I mean, starting with paragraph 8, it talks about some of the price, some of the pricing constraints, but you get on to the later paragraphs of the complaint, you have all these descriptions of loss of quality competition here, so you have, you have. You're not a question, I guess. You have to take as a given that even though what you say is true, I would find that this statute clearly prohibits the application of the antitrust laws to pricing decisions. That's the job of the authority. Now, if I start with that, then you'll say, okay, I have to decide against you. Or you might say, even so, I win because mergers are different. Now, that's what I'm trying to get you to do. Yes, and I guess that's what I'm – I guess that is what I'm trying to say, is that mergers are different, because the challenged Anticompetitive Act here is not a pricing decision by the hospitals. I want to ask you, why are they different? They're different. We have, one, the specific language I read, and two, I can think of examples where a merger would be anticompetitive under the DOJ and your FTC rules, and yet probably would further the purposes of the statute by lowering the cost. Do you think that's the null set? I don't think it is. Well, I don't know whether that is true or not, but I think we're relying on the more – I think you can't simply start with the idea that, well, any – you can't start with the premise that this Act exists to pursue an objective and to pursue it at any cost, without regard to whether it displaces competition in the market for paid health care services, without regard to whether it displaces competition for quality among these hospitals. I mean, on that logic, and I think it might help to look at some of the other powers here. If we – if you go to the back of the government's brief on page 6a, you know, the Well, I don't think that that implies a privilege to enter price-fixing contracts. That's part of the background principles of antitrust law. I also don't think it implies the power to enter contracts against public policy. A State presumably doesn't wish to abandon that background principle simply because it wants the authority to pursue its mission. But you've already told us that it can be State action for some purposes and not others. Exactly. So the fact that you have examples where you might conclude, no, they didn't mean to do that, doesn't seem to categorically suggest that you prevail with respect to another one of the powers that are granted. No, I agree with that, that it doesn't categorically. But it does – it does seem to me that if we're looking through this list of powers that the hospital authority has, there's not anything meaningfully different about the power to acquire property versus make contracts versus, as Justice Scalia said, any other powers that are – that exist in a general corporation's business charter. This may be completely wrong. You can tell me. I would doubt that in counties or municipalities of this size you're going to have, you know, five hospitals. And so that a – the authority could acquire a hospital and yet still not have any significant merger consequences on its face. In other words, when this law was passed, giving them the power to acquire hospitals, wasn't it the case that there would likely be only one other hospital or two, so that any acquisition of another hospital would have the merger consequences that this one had? Well, no, because I think the baseline when the statute was enacted was that the hospital authorities didn't even exist. So they didn't own any hospitals. And the first acquisition of a hospital can't raise a competitive concern, because it's not concentrating the market in any way. It's simply transferring ownership of the hospital from one actor to another. But just to follow up the Chief Justice's question, suppose it were shown that there were many rural counties, rural areas in Georgia, very much like this one, would that change this case? I thought that was the purport of the question, the thrust of the question. I think you'd have to imagine a very stylized hypothetical to see that the State had clearly intended to displace competition. You'd want to see, for example, let me give you a guess. Well, I know Georgia has 158 counties or something, so I think they probably have many rural areas with one or two hospitals. Well, right. But I suppose that guesswork is not going to be a basis for saying a State is clearly intended to displace competition. The situation in which I think you might recognize it is if the hospital authorities were already in existence, but they — and they all each owned a hospital, but they had never had the power to acquire a hospital. And you knew that they were all — that each of them had their neighboring competitor. And then the legislature comes in and says, you know, we'd like you now to actually be able to acquire additional hospitals. I mean, the power here is not the power to acquire additional hospitals. But if the legislature had said, we have the power to acquire additional hospitals and we know you already have one, and we know that the one you're going to acquire is going to be your neighbor, and we know there's not lots of hospitals out there, then you might say that, yes, the clear implication of that is that that's going to be the case. So I'm not sure where Your Honor is looking. They don't follow themselves in the statute, but I'm looking at Section 31 — well, where are we? —3, 1-7-75parn, 3parn. Shanmugam. Right. And so I think what you're referring to is number 27 on the list. And I think in the — in the health care industry, the idea of forming a network is not the idea of socializing all of the available resources under government control. A network is an integrated system where you can go to the hospital for your emergency care and they can refer you to an outpatient clinic that they have somewhere else, and there's a physician who has an arrangement with both of those who can track your care, and you can go acquire your durable medical equipment from some — from some store they operate. Sotomayor, that's what a network is. That's a vertical integration. A network is tying products. Yes, exactly, Your Honor. That's a tying situation. This is — this is a merger within — within one relevant market, and — and that's what's different. So I don't think the — And this falls within the words to acquire and operate projects. It does. But so — it does. But there's nothing about acquiring a project that is inherently — that's inherently anti-competitive. Acquisitions are not always anti-competitive. I guess that just adds on to the issues that we have a price-fixing mechanism, we have a tying mechanism that's expressed. So what's left after that? Just this? Well, I — Mergers and acquisitions? Well, no. I think — I think horizontal — generally horizontal agreements, I think you — so the contracting power doesn't — doesn't allow the hospital authority to go — I don't think the hospital here could any more merge with Palmyra than it could go enter into a contract with Palmyra that says, hey, we're going to, you know, fix the prices that we — They can't? In other words, two — the two hospitals in the town, when they say the price here, you shall see that the price is not higher than 38 cents of whatever. And would you please get together and be certain that you have similar terms and you have similar agreements and similar prices there? We don't want either to be higher. That way you would then proceed against them for that? Absolutely, Your Honor. This — this statute, if you take a step back a little bit — Would you also do the same if an electricity regulator in any State or a telephone — local telephone regulator — No, Your Honor. I think that's — — or a gas pipeline regulator. What they did is the same thing. They said our prices are in unified tariffs and the tariffs are to be reached after you go meet in committee, and that would also fall within the antitrust laws. No. I think those would likely be very different. I want to be clear about the point. The point of this law is to grant counties the opportunity to participate in this market by providing care to indigents. This is not a law about public utility regulation. If you think that this is a law about public utility regulation, that all hospitals are supposed to be — that the State intends counties to be able to elect to put all hospitals under their control and — and manage them as such and manage them in the way that a public service commission would regulate all of the utility— Well, the language is awfully similar to what you find in public utilities statutes to set reasonable rates to be certain that nobody is higher than a reasonable rate. Well, the authority does not have the power to establish — Justice Breyer, these are the words of the Court, but the authority does not have the power to establish rates at private hospitals. And that — that would be a signal difference between the authority's power in — in this case and the power of a public service regulator over a — over a utility. Breyer, what does it mean to establish rates and charges for the services and use of the facilities of the authority? The facilities of the authority, yes, but not other hospitals within the jurisdiction. It's only the — it's only the hospitals that the authority itself is — is operating. And so I — so I guess we also have here, I want to — I want to be clear that in all of this discussion we're — we're operating on the premise that it's actually the authority itself that is operating the hospital. Of course, that's not what this case is, these — these hospitals. Could you define necessity as you use it? I'm hearkening back to Justice Kagan. There are plenty of cases that say you don't need to find out whether the exemption is necessary to make the program work. Right. No, we don't think it means that. We don't make that judgment. No. No, it's not a normative judgment. Exactly. Correct. And in your answer, you conceded that whether — if — if there's discretion, it's not necessary to make it work because if the authority can say yes or no, it's not necessary. Exactly. So what's your definition of necessity? Our definition — our definition — well, I have to be honest, it's hard to define it because it's going to arise in a number of different contexts. But what this — but the times where this Court has used it, it has — it has used it to convey the idea that the — the choice that the State is offering is no choice at all if Federal law is going to come in, that Federal law would just negate the choice. So to be concrete about this, in Hallie, for example, the choice that the State provided at the end of kind of a complicated line of — of statutory rules about how — how cities do or don't have to provide their sewage treatments to their neighbors, at the end of the day, the City had a choice to say, fine, we will give you sewage treatment services, but you have to be annexed to us and, you know, take the other things that come with annexation to the City. Now, if that choice is for — is — if that choice is anti-competitive, it's going to be taken away by Federal law. And the choice that the State has tried to offer is no choice at all. It's going to be negated, and the only choice left for the — the City in Hallie is going to be to — to opt to just relent and give it sewage treatment services. Alito, if a State legislature articulates clearly and expresses affirmatively that it wants municipalities to share the State's antitrust immunity, is that sufficient or is there a degree of specificity that's necessary as to the particular anti-competitive conduct that the State wants to cover? Well, I think in your hypothetical, we're imagining kind of a municipality-enabling act that just has, you know, a section in it that says municipalities shall enjoy the State's exemption. Well, Georgia does seem to have such a statute. Yeah. So — so that — that's not a clear articulation problem, because it's plenty clear what the State's trying to do. There might be what I would call an affirmative expression problem there, because simply saying that the State doesn't want the antitrust laws to apply, that's not the basis in Federalism for the — for the State action doctrine. The basis in Federalism is that the State has made some affirmative choice, that it wants to accomplish something else, and that it's offered some principle on which the sub-State actors can — can act to serve the State's policy interest. And so I — I think you might have to hesitate in a case like that to say, well, if the — if the State is just passing out indulgences to — to get out of Federal competition law, that may not be something that substantively Federal law will stand aside for. Well, I don't want to take up your rebuttal time, but I don't see how that's consistent with your answer to Justice Kagan about a grant of discretionary authority. Well, I — I was assuming in Justice Kagan's hypothetical that we had some of the other things going on here that — that manifested a particular objective that the State was trying to pursue. So sort of the State trying to pursue municipal governance doesn't seem to me to be enough of a — an affirmative State policy to say that works. So I think that would distinguish the two, and if I could reserve. Thank you. Thank you, counsel. Mr. Waxman. Mr. Chief Justice, and may it please the Court. In the specific area of local hospital services, the Georgia legislature has adopted a model of local public choice, including the choice to reduce or eliminate competition. There is no issue here, Justice Scalia, with respect to your earlier question, of general corporate powers. The hospital authorities law creates local public authorities to, quote, exercise public and essential government functions to provide hospital care for residents, especially residents who cannot pay. It empowers authorities to acquire projects, plural, specifically including each authority the ability to acquire hospitals, plural, but with limitations. They have to — it has to be within a very confined geographic and demographic jurisdiction. And for authority hospitals, it replaces any pure market model with statutory mandates, a mandate to provide services to all indigent in the community and to price all services on a not-for-profit basis and with a statutory limitation on rate of return. There are — Well, I don't see how any of that pertains to whether they can create a hospital monopoly. You can do all of that, even though you're not the only hospital in the area. I guess my point here is that the legislature's — the powers that the legislature has given hospital authorities are not by any means general corporate powers. They are broader than what a corporate patient may have in certain respects and much narrower in other respects. And they — But the only respect relevant here is — is the only respect relevant is the ability to acquire other hospitals. That's right. And there is — And that's — and that's general corporate power. Every corporation in Georgia has the power to acquire, including acquire other businesses. There — there — these — these are the supervening wish, mandate of the legislature, and this is well explained in Georgia Supreme Court cases, particularly DeJarnett, which was decided right after Georgia amended its constitution and acted the hospital authorities law, was the desire to — the goal to provide adequate hospital services, particularly for the indigent. Georgia wasn't so sure because didn't it come in originally on the side of the FTC in this case? It did. And Georgia's complaint and its theory in the district court, which it did not pursue in the court of appeals or here, not — was not that the authorities weren't exercising State power, but that the contention that the operation of the hospital by this — the special purpose corporations that the hospital authority created was not adequately supervised. That is what the State was arguing in the district court. And when it lost that point, it withdrew from the case and has remained absent ever since. Kagan, our next question is from Mr. Wexner. Mr. Wexner, we do have a brief from quite a number of States and the brief basically says, we do this all the time. We set up these local authorities and then we give them powers because they have to act in the world. We give them normal powers, like the ability to make contracts and the ability to buy property. And when we do that, we don't mean that they can do anything they want notwithstanding the antitrust laws. And to construe these very normal powers that we would give to a State entity in order to allow it to operate as a permission to violate the antitrust laws is not at all consistent with our own intentions. I have no problem with the amicus brief filed by the States supporting the FTC in this case, which is posited quite expressly and at the outset on an understanding that what is involved here is simply a State authorization of creation of a local entity with general corporate powers and nothing more. That could not be farther from this case. These special purpose authorities do not simply have general corporate powers. They have a mandate. There is a Georgia constitutional amendment that coincided with the enactment of the hospital authorities law that derogated the States' duty to provide individual care to its — hospital care to its citizens. But I'm sorry, County. Kennedy, is it a fair characterization of your argument, is it a fair characterization of your argument to say that the possibility that the hospital authority can use its general power in this way is tantamount to or equivalent to the legislature intending that it be used that way? Is that your argument? No. We take seriously the standard that this Court announced in self-consciously clarifying the level of explicitness that a legislature has to use in Town of Hallie. This Court said — the Court asked whether, quote, suppression of competition was a foreseeable result of what the State legislature authorized, and it derived that formulation expressly from its earlier decision in City of Lafayette, which explained that a, quote, adequate State mandate exists when it can reasonably be inferred, quote, from the authority given a local entity to operate in a given area that the legislature contemplated the kind of action complained of. In other words, as I understand this Court's test, whether what was done by the hospital authority or any sub-State entity was foreseeable by a reasonable legislator, which in this case is that was it foreseeable that in pursuing the State-imposed mandate to serve the indigent in a low — in a confined jurisdiction, especially in rural counties which abound in Georgia, a hospital authority might require market power or even a public service monopoly, because that is the natural way to acquit the statutory entity. Sotomayor, there's a problem here, which is I understand the public mandate to serve the indigent, but you're asking us to take this a step further. You're elevating that public mandate to a public command that serving the indigent has to override the needs of the majority in terms of price competition. And that step, that further step that the State intended to immunize their — the And that's what I don't see. I see the compulsion to serve the needy. I hear that much of Georgia is rural, but your adversary says in most instances there's only one hospital. So the municipalities taking it over is not going to be a merger issue. To the extent that they step in and take over one of two hospitals, there's no merger issue because it's only substituting one owner for another. This situation, they claim, is a rarity, where there are only two or three providers and a hospital is going to — and a public — a municipality is going to then get monopoly power by an acquisition. So, Justice Sotomayor, as to your first point, our position is not that the only mandate is to serve the indigent. The actual mandate in the Constitution and the hospital authorities' law is to provide hospital services for all residents, with a particular note to the obligation to serve indigent clients. Second of all, we are not here to — I mean, I don't know where the government is coming up with its speculation that out of Georgia's — I think it's 154 counties for a population of 10 million people, it is the rare instance in which there will be anything other than just one or, you know, a multiplicity of hospitals. I mean, the Federal Trade Commission's guidelines for market concentration is anything up to four, four or fewer participants. The notion that the legislature in 1941 was providing the express authority to acquire multiple hospitals in a single municipality or county was focused only on huge metropolises of which there was only one, or on counties that were so small that they couldn't otherwise even attempt to support more than one hospital, is just fanciful. It's made up. And — Kagan Mr. Waxman, could I understand where you think this express approval is coming from? Because you said general corporate powers is not enough. So the general ability to buy property, you said, is insufficient. Then you have this idea of they have a mission. But the mission can be accomplished in all kinds of ways that are perfectly consistent with the antitrust laws. So that doesn't seem to get you all that far. So what else have you got to show that the State actually thought about this issue and approved this power for the hospital authorities? Okay. I mean, for one — one other thing is, in Section 7 — 7-77, as — as was noted before, the authorities are subject to regulation of rate of return. Now, if that doesn't bespeak the foreseeable consequence of market power, I don't know what — what does. That is the hallmark of a regulated public service monopoly, or at least the regulation of a return by a participant with market power. The other thing that exists, and the government pupusas is somehow not part of the hospital authorities law, is that the Georgia State legislature has — this is — this law was enacted in the backdrop of other laws in which Georgia has quite deliberately displaced, quote, unfettered private market competition. The Certificate of Need law is the paradigmatic example of the imposition of regulation at the expense of free market competition. And in fact — A lot of States have that. You can't open a new hospital without getting a Certificate of Need. Are you saying that in all of those States the — the result is that the antitrust laws can be ignored? No, no, no. Our argument is not that the certificate — that the existence of a Certificate of Need law indicates an intent by the legislature to fully displace the antitrust laws with respect to anybody else. My point is, in the context of other Georgia systems that strictly limit entry into or expansion into these local markets, combined with very severe rate restrictions, an obligation, a mandate to serve — Excuse me? I don't mean to interrupt, but the point that he's making in response to my earlier questions along these lines I think was the following. Where do they get their hospitals, these authorities? The law sets up a hospital authority. All right. Where did they get their hospitals? They can — I mean, the legislature permits them to be built on the place. Well, what's actually — I know what's actually happened. I mean, you know in fact where these hospital authorities got their hospitals from. You mean all of the hospital authorities in Georgia? Not all of them. I now am an accounting. And suddenly I'm the mayor and I see this law and it says we can set up a hospital authority. So, Joe, I say you're the boss, you're the hospital authority guy, and he says you're to run the hospital. He says, what hospital? We don't have a hospital. So I want to know where did they get their hospitals? The answer, Justice Breyer, I think — I mean, there's nothing in the record to indicate where all the hospitals. I don't need to know all of them. I just want some rough idea where they come from. Well, let's take the example of this. You may not know. No, no, no. Let's take the example of this county in terms of what was done and what is now being challenged. So when the hospital — there was a public hospital beginning in 1911 in Doherty County. When the State constitution was amended to impose on counties the State's obligation to provide adequate hospitalization care, it enacted the hospital authority law for counties that chose to make use of that device in order to acquit their public service mandate. And Doherty County did soon thereafter establish an authority and the assets, all of the assets and all of the operations of the existing hospital were transferred. There then — and there was a natural monopoly in that county. Breyer, I've got it. I've got it. Then he says this. Then, yes. Watch what he says. He says, I've been thinking of it the wrong way. I've been thinking of it like the California State Public Utilities Commission. They regulate all the electricity producers. That isn't this. Right. These were a group of people that ran some hospitals, some municipal hospitals. And now they can acquire not just General. I agree with you. It isn't just General. They have a lot of power there to acquire other hospitals from outside the system. But when they do that, there's no reason to think that that gives them the power to acquire it where it's anti-competitive. Now, the fact that you can regulate your own hospitals, which is one track and one group, doesn't say that you have to bring in anti-competitive people. I mean, you have to bring in others where they're anti-competitive. That, I think, is his point. Don't think of it as one thing. Think of it as two separate systems. We're not arguing that the hospital authority law gives the hospital authorities the right to regulate non-authority hospitals. We're not arguing for that. We're not arguing for that. You know, I know that. But once you don't, once you don't, he says, you see, they don't regulate prices of non-authority hospitals. They don't do this for non-authority. They don't do that for non-authority, even though they might have the power to bring them in. But when they have the power to bring them in, why read this as at least ambiguous? Why read this as saying you can bring them in where it's anti-competitive to do so? I mean, this doesn't say you can bring them in where it's anti-competitive to do so. That's their any and all hypothetical. And this Court has never required, for good reason, express authority. That was the whole point of City of Halley and City of Lafayette, Town of Halley and City of Lafayette. The point here is, okay, so they created a hospital authority. It ran a public hospital. It was a natural monopoly. The county grew. A private hospital developed. The public hospital, which is serving more than ten times the number of indigent patients than the private hospital, which is very underused, the county hospital has been telling the hospital authority has been saying for years and years and years, we need more capacity, we need more capacity. In order to accomplish our mission, there are two ways to do it. We can only operate in this confine. We can build a new hospital and here's what it would cost and here's what we would get, and we would, by the way, have to satisfy the State authorities that we are entitled to a certificate of need in a context in which the private hospital is severely underutilized. Or we can talk with the private hospital about whether they would like to be acquired. And the record shows that they did that for many, many years, even before the city company entities were created. Sotomayor, I'm showing my ignorance. Is this – would this merger be subject to the rule of reason? If we were not to find State immunity, would the merger be subject to the rule of reason? I am embarrassed to say I don't know enough about the German Act law to say that. I was embarrassed to ask the question, but I was taught to ask the question. If it is, I'm going to assume it is. Sotomayor, we'll both be – we'll both be corrected by our respective colleagues soon enough. But if it's – Probably me sooner than you. That's likely. But my question is really more fundamental, which is, yes, I understand that you have a great defense, potentially, to a rule of reason challenge, that there was necessity in its truest sense, in its economic sense, in this situation. So why should we undo our decades of writings that say that we should construe immunity narrowly and not broadly when it comes to displacing our antitrust laws? Because the point of State action immunity, which is respect for the sovereign choices of sovereign States, is – exists not only to provide a defense – an ultimate defense in litigation on the merits, it's to protect States and sub-State entities from the costs of litigating. I mean, the question ultimately in this case, and in all these cases, is who gets to decide? Who gets to decide if this is reasonable or not? Is it the Federal Trade Commission that comes in and files a lawsuit for this poor hospital authority? I mean, that's right. It is about choices. But the question is whether the State has made a choice. And that's what all these cases are about. Right. They are trying to find whether the State has made a choice as to this kind of conduct. Right. So now we have your corporate powers aren't enough, your general mission isn't enough. You set a certificate of need. But a certificate of need, it isn't even given out by this authority. It's something that has nothing to do with the powers of this authority. Then you said there's some kind of price regulation that happens as to the hospitals that the authority owns, but not with respect to other hospitals. So I guess I'm still looking for the things that show that the State has made a choice, that it wants these hospital authorities to be able to make anti-competitive purchases. Where do I find that? I may not be able to convince you, but let me take another run. I think it's the combination, because as this Court has expressed repeatedly, it's one has to look at the specific power granted, which here is the power to acquire hospitals within a very circumscribed jurisdiction, in the context of the law as a whole. The context of the law as a whole here, and I hope this works for the Court, but if it doesn't, you know, perhaps I'm wrong, it certainly makes this a stronger case than Hallie, here we have a law that says counties have the obligation now, unlike the State, to provide adequate hospitalization services. They will exercise — what they do is deemed to exercise public and essential government functions within strictly limited areas, and they have the power to acquire hospitals in those areas subject to very strict rate of return regulations and very, very strict conditions on how they operate those hospitals, including the power to lease to an operator for — in order to serve the public mission. And they do that against a backdrop of a series of — they have eminent domain power, they can take another hospital if it is essential to fulfill their mission. And they do this in a backdrop of a State that has, notwithstanding the advocacy of the Federal Trade Commission, has repeatedly strengthened, rather than abrogated, a certificate of need law that leaves— Ginsburg. Mr. Waxman, you are essentially interpreting the Georgia statute that sets up the hospital authority, and you're saying this is how we read it. We start with the antitrust exemption is for the State, not subdivisions. So the State has to give it to the subdivision for the subdivision to have it. Could the Federal court have said, we would like to know what the Georgia legislature, what the Georgia authorities think this statute means. So could a question have been certified — I don't know if Georgia has a certification procedure — but to the Georgia Supreme Court and say, tell us, does this statute — is it intended to transfer the State's immunity to the locality, to the local  Waxman. I mean, I — I assume that the Georgia State courts could do that, but, Justice Ginsburg, I think it's important to recognize that the FTC doesn't dispute that the local — that hospital — county hospital authorities are, in fact, agents or arms of the State. Ginsburg. But the question is, does this legislature mean that the State is transferring its immunity to this local unit? Waxman. And I believe the FTC — Mr. Horwich can correct me if I'm wrong, but I believe the FTC's position is generally, yes, but not with respect to the — what is alleged to be a merger to monopoly. And the question in this case is whether or not the acts for — under this law, and applying the foreseeable result standard, whether the acts of the hospital authority in this case in approving and acquiring the second hospital are fairly attributable to the State. And if I can just finish. Scalia. Mr. Waxman, if you don't want to be interrupted, you have to pause between sentences. Waxman. I was taking a cue from Your Honor's last argument. Scalia. That's right. You've given a, you know, an appealing example of a small county that has one hospital, and this operation purchases that one hospital. Seems nothing wrong with that, although as Justice Sotomayor suggests, I doubt whether the FTC would be pursuing a situation in which there is a natural monopoly. It's a question of whether the monopoly be owned by the State or not. But your argument, if we follow it, embraces a quite different situation. A very large in price, in specialties. They advertise on the radio, as some hospitals do. And what you're saying is that this operation can take over all of those hospitals and eliminate all of that competition. Isn't that so? Waxman. Well, I — for purposes of Federal antitrust law, yes. Scalia. Yes. Waxman. But for purposes of State law, almost certainly no. And the point here is — and the point here is that Georgia, either — through both private suits and actions authorized by its Attorney General, can take steps in order to restrain hospital authorities from doing what they can't. And, in fact, Georgia can do that. Scalia. We have no idea whether they're willing to do that. Waxman. No, yes, we do. Scalia. And we have a Federal antitrust law. Waxman. We absolutely do, Justice Scalia. There is a solid line of cases in which the Georgia Supreme Court has — has quite rigorously enforced the limitations of the hospital authority law in order to prevent hospital authorities from doing things that it says the legislature didn't intend. The Tift County case is the best example, but there are others cited in our brief. Scalia. Would you say that — why didn't it intend this? I don't understand. You've told us that they did intend this, that they did intend to displace competition. Waxman. Yes. Scalia. And now you say, but Georgia will say, oh, no, they didn't intend to displace  Waxman. No, no, no. Scalia. Which is it? Waxman. My point is that, with respect to your hypothetical, whether the hospital authority of Fulton County — and I believe there's more than one hospital authority in Fulton County, and they are authorized to merge in any event, but could they acquire by purchase or eminent domain all of the hospitals in metropolitan Atlanta to do so? And my point is that, for purposes of Federal antitrust law, the answer is, you are out. That's — you're not the authority to inquire. The question is, just as this Court — you explained for the Court in Omni, there may be very many things that a local authority can do that would violate State law, and there are State law remedies. And my point only was that the Georgia Supreme Court has been very quick to enforce the limitations, but as a matter of Federal antitrust law, the only question is, were they authorized to do things like this? Breyer. They said that they say on that that this is a sham. We'll just say 30 seconds on their argument that the FTC looked into it. These people have never regulated anything. They've never looked at any price anywhere. They've never done a single thing. It's a sham, and therefore that's the end of it. What about that? Waxman. Okay. If I can just finish my answer to Justice — I have one other point to make for — to Justice Kagan, who's asked it twice. My last point I want to make, and then I'll answer this, is that this county, this hospital authority, like many, facing a capacity constraint and a nondiscretionary mandate to serve the public needs for hospitalization, had two choices. It could have tried to convince the State to spend three times as much money to get half the number of beds, notwithstanding the existence of excess capacity, or it could buy the other hospital and get that capacity in a consensual transaction by the authority. And here's my point, Justice Scalia. This case is on all fours with this Court's decision in Omni. The notion that this may have long been desired by this special purpose entity is totally irrelevant. This acquisition was proposed to, considered by, and approved by the hospital authority, and not only that, when the FTC came and complained about it, they reconvened another public meeting and discussed it again, and came to the conclusion again that they wanted to acquire this hospital, and before they signed the lease, they issued a notice and comment period. There was three months for people to tell the authority whether this lease was or was not consistent with community interests. They had a public meeting and they approved it. And that is the act of the State. Roberts Does the State have a procedure where it can give real-time approval? In other words, this is going on and the hospital authority says, boy, the FTC is sending us these letters. State, could you do something to show that you approve this transaction? Whether it's a special law or there's some organization, I guess in some other case, set up that could give its approval. Is there? I mean, this is the hospital authority's law says, counties, this is your responsibility, here are your powers. If anybody in the State or any competitor or the attorney general thinks that you are abusing those statutory powers, the courts are open and quite receptive to those  But there's no way to do that. Roberts No, I know. I guess my point is, can the burden of going forward be switched the other way? And can this hospital authority say, you know, to the State, we'd like some blessing on this so that we can go ahead with it? So the choices aren't really build your own hospital or acquire the other one in the abstract, but ask the State, you know, what do you want us to do? Do you want us to build a new hospital or is it okay if we acquire this one? I don't believe there is any such mechanism, and I believe that the State, the legislature didn't contemplate anything like that because the mandate and the responsibility and the authorization was devolved to the counties. Now, Mr. Chief Justice, what the hospital authority could do and did do, although it's not in the record of this case, is evaluate the likelihood of getting a certificate of need to build the additional required facilities. Thank you. Roberts Thank you, counsel. Mr. Horwich, you have 4 minutes remaining. Horwich, thank you. I guess I heard several members of the Court asking Mr. Waxman specifically, where do you find this, where can you locate this intent to displace competition in a statute? And I'd like to just run through, if I could, each of his answers and why I think they're insufficient. So the first one, of course, we've talked a lot about the existence of general corporate powers, but the most natural inference there is that the State expects those to be exercised in conformity with the background principles that anybody else who has general powers has. Now, the idea that the authority has a mandate, a purpose it's supposed to serve, of course, that's always true. States always have some purpose in mind when they set up some sub-State entity. The question isn't whether there's particular ends the State is trying to pursue. The question here is whether the State intended to pursue those ends through the particular means of displacing competition, here displacing competition in the market for paid health care services. And, see, Mr. Waxman also pointed to the rate of return provision in the statute. Now, as a sort of a threshold matter, there's the past is prologue. There's not any reason to think that that will be rigorously enforced with respect to the privately controlled operations here. But that's sort of the second question presented, and we can set that aside for the moment, I guess. But it seems to me there are two far more natural explanations for the presence of the rate of return provision in the statute than the one Mr. Waxman would like you to give to it. The first explanation is this is a statute about providing public care for indigents. Nobody should be making a profit off of that, and the State wants to say that. And that seems to be a very natural explanation that doesn't depend at all on the State intending to displace competition completely. The rate, the price regulation provision also can be naturally understood as a response to the recognition that there will be some de facto monopolies in the situation where there's only one hospital in the county. But it doesn't mean that the State wants there to be more monopolies so that it can bring in the unfortunate medicine of rate regulation to respond to those. Presumably, the State intends, as is the accepted background principle of free market competition in this country, that there won't be monopolies unless they arise of necessity. Sotomayor, yes. Sotomayor, I interrupt you just a moment to address a question raised by Justice Breyer, which is your alternative argument. Yes. You have lots of evidence that the authority does very little oversight of these hospitals when they move forward. But is that the issue before us? Is the question of immunity as to what happens in the operation of the hospital or in their merger and acquisition, their actual formation? And so that to the extent that we were to conclude that the State has delegated immunity on the basis of merger, why do we need to look any further at whether there has or has not been an appropriate degree of supervision of that decision? Right. Well, the — I don't think the two are entirely — aren't entirely separable as a matter of competition law, because the reason competition law is concerned with mergers is not because of the transaction as such, but it's because of what it does going forward to the structure of the market and the competitive behavior of those in the market. And so the State action doctrine says that the State, if the State's going to go create a monopoly, it needs to take ownership of that monopoly. And I'm using ownership not in the literal sense, but at least ownership in the sense of actively supervising the monopoly to be sure that it is pursuing the objectives that the State has in mind for creating it. So that's why we're still concerned there. Mr. Waxman referred to the Certificate of Need law. I think there's a very close analogy to be drawn to Goldfarb here. That's the question of minimum fee schedules agreed to by lawyers. The State of Virginia regulated entry into the market for the practice of law, just as the Certificate of Need regulates entry into the hospital market, but horizontal agreements among people already in the market, such as here and such as the minimum fee schedule in Goldfarb, are not exempt just because of it.  Roberts. Thank you, counsel. The case is submitted.